FRANK A. FAZZIO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fazzio v. Commissioner
Docket No. 2748-89
United States Tax Court
T.C. Memo 1990-608; 1990 Tax Ct. Memo LEXIS 683; 60 T.C.M. (CCH) 1328; T.C.M. (RIA) 90608; December 3, 1990, Filed *683 Decision will be entered under Rule 155. Leon M. Schurgin, Deborah S. Hack *684 , and Chauncey W. Tuttle, Jr., for the petitioner. Margaret A. Satko, for the respondent. HAMBLEN, Judge. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioner's 1984 Federal income tax in the amount of $ 1,079,267 and additions to tax under sections 6653(b)(1), [1]6653(b)(2), and 6661 in the amounts of $ 539,634, 50 percent of the interest due on $ 1,079,267, and $ 269,817, respectively. Respondent also applied the increased interest rate set forth in section 6621(c). The issues to be decided are (1) whether income reported as capital gain by Frank Fazzio (hereinafter petitioner) is ordinary income; (2) whether petitioner is entitled to his reported professional fee deduction; (3) whether petitioner is liable *685 for additions to tax under section 6661 because his underpayment of Federal income tax in 1984 was substantial; (4) whether petitioner is subject to the increased interest rate under section 6621(c); and (5) whether petitioner is liable for additions to tax under section 6653(b) because all or part of his underpayment of Federal income tax in 1984 is due to fraud. FINDINGS OF FACT Some of facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner resided in Bloomfield Hills, Michigan, at the time the petition in this case was filed. Petitioner graduated from the University of Detroit in 1960 with a bachelor's degree in mechanical engineering. He became a sales representative of Trane Corporation, a manufacturer of HVAC (heating, ventilation, and air conditioning) equipment. He was continually employed by Trane Corporation, usually in the Detroit metropolitan area, until 1978. In 1978, petitioner left his employment with Trane Corporation to form his own manufacturer's representative company. Together with Alan Feldman, he formed H-VAC Sales, Inc., a Michigan corporation (hereinafter *686 H-VAC). Petitioner and Mr. Feldman each held 50 percent of the shares of H-VAC. H-VAC sold many product lines from a number of different manufacturers, including the products of Gamewell Mechanical, Inc. (hereinafter Gamewell Mechanical). H-VAC sold on a commission basis and also had a buy-sell arrangement with Gamewell Mechanical and its other manufacturers. H-VAC utilized a number of salesmen in addition to petitioner and Mr. Feldman. Petitioner told the sales representatives of H-VAC how to write purchase orders under the buy-sell arrangement. As suggested by petitioner, each salesperson operated as an independent contractor, with most salespersons using a wholly owned corporation to receive their split of the commissions earned. Petitioner received his share of the commissions earned on the jobs he sold through his wholly owned corporation, Engineering Diversified Corporation. Gamewell Mechanical was located in Salisbury, North Carolina. It was engaged in the manufacture of sophisticated industrial cooling, heating, and air handling units for placement in component form or as environmental control package systems and also operated as a conventional mechanical contractor *687 in the field of industrial and commercial heating, air conditioning, process air handling, plumbing, and process piping systems. It was owned by two brothers: Tomme T. Gamewell and Joseph M. Gamewell. Business was conducted at H-VAC consistent with the existence of a buy-sell arrangement with Gamewell Mechanical. Although strictly a sales organization representing manufacturing companies, H-VAC would sometimes invoice the ultimate customer in its own name and, at other times, invoice the ultimate customer in the manufacturer's name. Buy-sell arrangements are not unusual in the H-VAC industry. Generally, such an arrangement allows the manufacturer's representative to buy the product and then sell it for whatever he can get for it. The difference between the amount the manufacturer's representative pays for the product and the amount he sells it for constitutes his profit. For a sale under the buy-sell arrangement between H-VAC and Gamewell Mechanical, an invoice was made from the ultimate purchaser to H-VAC who then issued another purchase order, on its own preprinted form, to Gamewell Mechanical, in its own name, for a smaller amount. All profits of H-VAC were split equally *688 between petitioner and Mr. Feldman. Payments on the larger purchase orders between the ultimate purchaser and H-VAC were made directly to H-VAC. H-VAC then paid Gamewell Mechanical amounts due on the smaller purchase orders. In 1977, petitioner joined efforts with Gamewell Mechanical to design an air handling unit for Hydra-Matic, a General Motors Division, to be used in the manufacturing of automobile transmission. While working together, petitioner contributed his know-how and reputation while Gamewell Mechanical contributed the facilities, engineering, testing, and patents. After numerous tests and engineering changes, Hydra-Matic was convinced that the prototype developed by petitioner and Gamewell Mechanical would solve their problems and agreed to purchase the units. The initial purchase order was from Hydra-Matic to H-VAC. H-VAC had a separate agreement with Gamewell Mechanical to produce the unit at a particular price. Any additional proceeds that H-VAC could sell the unit for belonged to H-VAC. Indeed, H-VAC was responsible to Hydra-Matic for completion and delivery under the agreement even though H-VAC had no facility to produce the units. Because of petitioner's *689 concerns about the ability of Gamewell Mechanical to continue delivering the units, petitioner, Mr. Feldman, and Gary Canter formed Gamewell Manufacturing, Inc., a Michigan corporation (hereinafter Gamewell South), on December 10, 1979. Gamewell South purchased the manufacturing work in process, the associated patents, and the inventory of Gamewell Mechanical on January 8, 1980. Further, Gamewell Two, a Michigan partnership formed by petitioner, Mr. Feldman, and Mr. Canter, purchased the fixed assets of Gamewell Mechanical on December 31, 1979. Petitioner owned 60 percent of the stock of Gamewell South and had a 60-percent interest in the partnership while Mr. Feldman owned 30 percent of the stock and had a 30-percent interest in the partnership. The remaining 10 percent of the stock and partnership interest was owned by Mr. Canter. Gamewell South established books of account and a recordkeeping system at the plant location in North Carolina. It reported its income on the percentage of completion method for accounting purposes and on the completed contracts method for tax purposes. After Gamewell South was formed, H-VAC became its sole Detroit-area sales representative. H-VAC *690 continued the same buy-sell relationships with Gamewell South under the same terms and conditions as with Gamewell Mechanical. Mr. Canter was hired by H-VAC in 1979. He had previously been employed by General Electric. He became the vice president and general manager of the manufacturing facilities of Gamewell South in January of 1980. Mr. Canter managed the day-to-day operations of Gamewell South until its reorganization in March 1984. After the reorganization, petitioner took over the full-time management of the company. Procedurally, sales representatives of Gamewell South were authorized to solicit inquiries for quotation or bid for each proposed job and forward it to the sales representative involved. Between 1980 and the last quarter of 1983, Mr. Canter reviewed all quotations. Petitioner also reviewed all quotations for large jobs. For the last quarter of 1983, and subsequent thereto, only petitioner reviewed the proposed quotations. Between January 1, 1980, and April 24, 1981, H-VAC entered into at least two sales of products of Gamewell South to Hydra-Matic under the buy-sell arrangement. On the two jobs, H-VAC had income of $ 1,364,444.50. This amount reflects *691 the different between the purchase price paid by Hydra-Matic to H-VAC and the price H-VAC paid Gamewell South for the merchandise. H-VAC paid a commission to its salesmen of approximately 60 percent of the income earned, keeping the other 40 percent as its profit. Mr. Feldman considered the income from the two sales to belong to H-VAC, not Gamewell South. In fact, some of the profits received by Mr. Feldman, as part owner of H-VAC, were attributable to the $ 1,364,444.50 generated on the two purchase orders. The income generated on the these two jobs was always held by H-VAC and never held by Gamewell South. H-VAC bore the risk on the purchase orders between itself and the ultimate purchaser. H-VAC had to pay Gamewell South regardless of whether H-VAC collected the purchase price from the ultimate purchaser or not. H-VAC also bore the risk of completion. If the product was not delivered, the ultimate purchaser would hold H-VAC liable for performance. Hydra-Matic made payment on these purchase orders directly to H-VAC. On April 8, 1981, Mr. Feldman sold his interest in Gamewell South and Gamewell Two to petitioner for $ 242,000. Afterward, petitioner owned 90 percent of *692 Gamewell South and Gamewell Two with the remaining 10 percent owned by Mr. Canter. By mutual agreement between petitioner and Mr. Feldman, H-VAC ceased operations on April 24, 1981, except for collecting and distributing the commissions on jobs previously sold and for paying outstanding liabilities. Subsequent to April 24, 1981, Engineering Diversified, Inc., petitioner's wholly owned corporation, became the sole Detroit-area sales representative for Gamewell South. On April 28, 1981, Engineering Diversified, Inc., changed its name to Gamewell, Inc. (hereinafter referred to as Gamewell North). Gamewell North continued on as Gamewell South's sole Detroit-area sales representative. Gamewell North maintained the same employer identification number as used by its predecessor, Engineering Diversified, Inc. Gamewell North also maintained bank accounts in Michigan, under the same employer identification number as Engineering Diversified, Inc. Gamewell North used the same offices as where H-VAC had previously conducted business. It kept books of account and records of its financial activities, all physically located at the Michigan office suite. Gamewell North was a cash basis taxpayer *693 for both accounting and tax purposes. Gamewell North secured orders for the products of Gamewell South on a commission and on a buy-sell basis. In the commission transactions, including those by Gamewell North, sales of a product manufactured by Gamewell South were booked on Gamewell South's records in the same amount the ultimate purchaser paid for the product. Gamewell South received all of the purchase price and then paid a commission to the sales representative responsible for the sale. Gamewell South also continued the buy-sell relationship with Gamewell North under the same terms and conditions as before. Petitioner had a long-term relationship and good rapport with General Motors Corporation. General Motors trusted petitioner. Gamewell South entered into the buy-sell transactions with Gamewell North to obtain the lucrative sales available to petitioner. In the buy-sell transaction, Gamewell North acted on a customer level, submitting formal orders in its own name to Gamewell South. Both parties recognized that such purchases by Gamewell North were for resale to the ultimate customer and that in doing so, Gamewell North achieved a profit on the resale. Gamewell South *694 consented to and authorized this practice. Neither H-VAC nor Gamewell North submitted the proposed written quotation or bid as prepared by Gamewell South to the ultimate purchaser. A new quotation or bid was prepared by H-VAC or Gamewell North in a larger amount than paid to Gamewell South and forwarded to the ultimate purchaser. During 11 sales under the buy-sell agreement from 1980 to 1983, Gamewell South proposed a bid price, for the sale of its goods, that it sent to Gamewell North. [2] Gamewell North then increased the bid price before sending the bid to the ultimate purchaser. Once the bids were accepted, Gamewell North collected the higher payment price from the ultimate purchaser and paid Gamewell South the lower originally proposed bid price. Gamewell North entered the higher price on its books while Gamewell South recorded the lower price on its books. Gamewell South did not pay commissions to Gamewell North on five of the nine purchase orders between itself and Gamewell North. The difference between the amounts on the purchase orders in question issued by the ultimate user to Gamewell North and the amounts on the purchase orders issued by Gamewell North to Gamewell *695 South totaled approximately $ 3,131,025. This difference was retained and held by Gamewell North. The buy-sell arrangement between Gamewell South and Gamewell North continued through 1984. Numerous persons in the offices of Gamewell South knew about the buy-sell arrangement. The buy-sell transactions were obvious from the bids and purchase orders that were written by Gamewell North to Gamewell South, which were available to the recordkeepers and estimators of Gamewell South. In the buy-sell transactions, all payments made by the ultimate purchaser were made to Gamewell North and deposited *696 into its bank accounts. They were booked and reported in the income of Gamewell North at the time of receipt. Gamewell North then paid Gamewell South the amounts due on the purchase orders written by Gamewell North to Gamewell South. These payments were deducted by Gamewell North as cost-of-goods sold in the year made. The profits were not reflected as a "payable" on the books, records, or tax returns of Gamewell North. The alleged profits were not reflected as a receivable on the books, records, or tax returns of Gamewell South. Gamewell North again bore the risk of performance, the risk of completion, and the risk of collection on the purchase orders between itself and the ultimate purchaser. The purchase orders between Gamewell North and Gamewell South were also treated as contract sales by Gamewell South. The lesser amounts stated thereon were entered as the contract price on the books and records of Gamewell South. The purchase orders between Gamewell North and Gamewell South were reviewed by Mr. Canter and petitioner and were authorized by Gamewell South. Gamewell South made its normal profit percentage on these jobs under the buy-sell agreement. Mr. Canter knew *697 that profits were made by Gamewell North on products sold through the buy-sell arrangement. He did not consider these profits to belong to Gamewell South. In mid-1983, petitioner became desirous of selling his interests in Gamewell Two, Gamewell North, and Gamewell South. Later, petitioner decided not to sell Gamewell North because he wanted to retain the lucrative General Motors accounts. In late 1983, serious negotiations commenced with the investment firm of Gray & Flowers (hereinafter also referred to as Mr. Gray). Mr. Gray originally offered less than $ 6,000,000 for the stock of Gamewell South and assets of Gamewell Two, exclusive of Gamewell North. Petitioner wanted slightly more. By January of 1984, they came to an understanding that the price would be approximately $ 6,000,000. The parties still needed to negotiate the exact terms and allocation of the sale. The negotiations centered around the allocation of the purchase price, the amount to be financed, and the amount of any down payment. Petitioner then advised Mr. Gray that he wanted to restructure the transaction. Petitioner informed Mr. Gray that Gamewell South had approximately $ 3,000,000 in additional *698 cash that was being held by Gamewell North. Petitioner also discussed his possible tax advantages with Mr. Gray that would result by restructuring the sale so as to include the additional $ 3,000,000. Petitioner was represented by his accountant, Alan Glasser, during negotiations with Mr. Gray. Mr. Glasser was not aware of the approximately $ 3,000,000 allegedly held by Gamewell North for Gamewell South until petitioner told him of that fact during negotiations for the sale of his Gamewell South stock. The services of another accountant, Steven Rock, were also utilized by petitioner. Neither Alan Glasser nor Steven Rock gave petitioner an opinion regarding whether the funds in question belonged to Gamewell North or Gamewell South. Further, Alan Glasser and Steven Rock did not have sufficient information to render such an opinion, even if asked. On January 17, 1984, Mr. Gray revised his offer premised upon petitioner's "election" to make the special advance payment of approximately $ 3,000,000 from Gamewell North prior to closing. He offered to purchase the stock of Gamewell North and assets of Gamewell Two for $ 8,300,000, inclusive of the $ 3,000,000 transfer. However, after *699 consulting with his attorney, Mr. Gray advised petitioner on January 23, 1984, that the $ 3,000,000, if considered to be payments, may have to be included in income. Since they had no offsetting deduction, such treatment would be unacceptable to Mr. Gray. He revised the January 17, 1984, offer. He excluded petitioner's election to make the $ 3,000,000 advance payment, reduced the offer to $ 4,600,000 for the stock and assets, and reduced cash at closing by the $ 3,000,000 advance payment by petitioner. Petitioner was adamant; he wanted the $ 3,000,000 transfer included in the sale of his Gamewell South stock. By letter dated February 9, 1984, Mr. Gray revised his offer in an attempt to accommodate petitioner's tax objectives. During all negotiations between petitioner and Mr. Gray, it was understood that if less than $ 3,000,000 was transferred from Gamewell North to Gamewell South, the sales price and cash at closing would be reduced accordingly. Petitioner was also seriously negotiating with the Sanitas Service Corporation (hereinafter referred to as Sanitas). By letter dated February 23, 1984, Sanitas formally offered to purchase Gamewell Manufacturing-Salisbury, Gamewell *700 Manufacturing-Detroit and Gamewell Two for $ 9,000,000 allocated as follows: Gamewell
Gamewell
Gamewell
Salisbury
Detroit
Two
Total
Petitioner
$ 4,500,000
$ 3,000,000
$   900,000
$ 8,400,000
Mr. Canter
500,000
---
100,000
600,000
Total
$ 5,000,000
$ 3,000,000
$ 1,000,000
$ 9,000,000
Serious negotiations proceeded between petitioner and Sanitas. Petitioner then informed Sanitas of his interest in restructuring the transaction. He explained his plan to transfer the approximately $ 3,000,000 from Gamewell North to Gamewell South, which amount he intended would be returned to him as part of the purchase price. An agreement was drafted, in March of 1984, whereby Sanitas would purchase the assets of Gamewell Two for $ 1,700,000 and the stock of Gamewell Manufacturing-Salisbury for $ 7,300,000, inclusive of the $ 3,000,000 transfer. Gamewell Manufacturing-Detroit was not part of the proposed sale. Petitioner continued to negotiate with Sanitas. On June 20, 1984, Sanitas increased its $ 9,000,000 offer to $ 10,000,000, inclusive of the $ 3,000,000 cash transfer. By telephone on June 28, 1984, Sanitas increased the cash portion *701 of its offer to $ 3,500,000, assuming there was $ 4,000,000 in cash in Gamewell South at time of closing. Petitioner memorialized these negotiations by making handwritten notes. These notes reflect that the buyer's increased offers were based on the assumption that at least $ 3,000,000 would be transferred into Gamewell South by petitioner before any sale took place. Petitioner's notes regarding the negotiations with Sanitas, dated September 11, 1984, further reflect that Sanitas agreed to pass through the $ 3,123,447 transfer to petitioner upon Sanitas' purchase of Gamewell South. It should be noted that all offers between eight and 10 million dollars, by either Gray & Flowers or Sanitas, were conditioned upon the premise that petitioner would transfer the approximately $ 3,000,000 from Gamewell North to Gamewell South prior to closing. If less than the $ 3,000,000 was transferred, the sale price and cash payment would be similarly reduced. Petitioner wanted all of the $ 3,000,000 transfer to be paid to him at closing, unreduced by the tax that would be due thereon if characterized as income to Gamewell South. Petitioner was unwilling to assume any of the tax burden that *702 would fall on the corporation due to transfer of the $ 3,000,000 if characterized as payments as he proposed. Indeed, one of the reasons petitioner was unwilling to accept the Sanitas offer, even though they offered $ 1,000,000 more than Gray & Flowers, was that Sanitas was unwilling to accept the tax consequences of the $ 3,000,000 transfer if characterized as proposed by petitioner. During negotiations, petitioner sent $ 3,100,530 from Gamewell North to Gamewell South. First, on March 23, 1984, at petitioner's direction, Gamewell North sent a check, payable to Gamewell South, in the amount of $ 1,060,530. The check was deposited on March 29, 1984, in an account held in the name of Gamewell South, located at the North Carolina National Bank in Salisbury, North Carolina. Gamewell North deducted the check amount as a cost of goods sold on its income tax return for the period ending June 30, 1984. Again, at the direction of petitioner, on May 31, 1984, Gamewell North transferred $ 2,040,000 to an account held in the name of Gamewell South at the same bank, via wire transfer. Gamewell North again deducted this payment as well as a cost of goods sold on its income tax return for *703 the period ending June 30, 1984. Petitioner directed the bookkeeper of Gamewell South, Carl Wilhelm, to "book" the $ 2,040,000 transfer on the next unused job number as an advance payment and to prepare an invoice for the amount. Job number 430-270 was assigned to this invoice. No purchase order was received for this job. Gamewell Holdings was incorporated on March 23, 1984, by the principals of Gray & Flowers and other investors. Petitioner and Mr. Canter, on behalf of Gamewell South and Gamewell Two, and Mr. Gray, on behalf of Gamewell Holdings, executed an agreement, dated July 2, 1984, which provided for a selling price of $ 7,623,447 for the stock of Gamewell South and $ 1,500,000 for the assets of the Gamewell Two partnership. Petitioner received $ 7,173,447 for the sale of his stock and $ 1,350,000 for his share of the partnership assets while Mr. Canter received $ 450,000 for his stock and $ 150,000 for his share of the partnership assets. The financing for purchase of the stock of Gamewell South and assets of Gamewell Two was obtained by Gray & Flowers after disclosure of the pass-through of the $ 3,123,447 from Gamewell North to petitioner. The $ 7,623,447 purchase *704 price was contingent upon a $ 3,123,447 cash transfer from Gamewell North being in Gamewell South on the date of sale. Thus, Mr. Gray parted with only $ 4,500,000 for the purchase of the Gamewell South stock separate from the $ 3,123,447 transfer by petitioner and back to him again. At the direction of petitioner, Gamewell South transferred a majority of these funds from North Carolina National Bank to Branch Banking and Trust Company in Lexington, North Carolina. There, these funds were commingled with other funds directly deposited by petitioner. All of the money deposited into the Branch Banking and Trust account came from petitioner. On July 6, 1984, Gamewell South purchased a certificate of deposit in the amount of $ 3,123,447 from Branch Banking and Trust Company. The existence of the account at the Branch Banking and Trust Company did not appear on books or records of Gamewell South for the period ending July 31, 1984. Further, the money in the Branch Banking and Trust account was not used to pay creditors even though receivables were late and Gamewell South had trouble paying its bills. In 11 instances, the contract prices on the jobs-in-progress sheets, contract *705 price column, were increased under the direction of petitioner to reflect the $ 3,123,447 returned to the company. No change orders or additional work was associated with the increased contracts. As the interest was generated from the account held at the Branch Banking and Trust Company in Lexington, North Carolina, petitioner instructed the comptroller of Gamewell South, Mr. Wilhelm, to deposit the funds to the North Carolina National Bank account of Gamewell South and remit a check to petitioner, personally, from the same account, for the same amount. Mr. Wilhelm did what petitioner told him to do with respect to maintenance of the books and records. The amounts of interest transferred to petitioner totaled approximately $ 111,128. The interest received by Gamewell South was credited on the books of Gamewell South to interest earned, and the payment to petitioner was debited on the books of Gamewell South to interest earned, thus creating a wash for bookkeeping purposes. Petitioner did not report the interest he received on his personal Federal income tax return for the 1984 year as income. The sale of the stock of Gamewell South and the assets of Gamewell Two closed on *706 September 28, 1984. In preparation for the closing, Gamewell South opened a bank account at Connecticut National Bank. On September 21, 1984, the $ 3,123,447 at issue herein was wired from the Branch Banking and Trust Company to the Gamewell South account at Connecticut National Bank. On September 28, 1984, the $ 3,123,447 at issue herein was transferred from the account of Gamewell South at Connecticut National Bank to the account of Gamewell Holdings, Inc., at Connecticut National Bank. Upon closing of the sale of the stock on September 28, 1984, Gamewell Holdings, Inc., made a wire transfer of $ 6,223,447 from its account at Connecticut National Bank to the credit of petitioner. This amount included the $ 3,123,447 which was wired to the Gamewell Holdings account earlier that same day by Gamewell South. Petitioner also received $ 350,000 deposited in escrow on his behalf. The remaining $ 500,000 was paid separately. Mr. Canter received $ 50,000 and a $ 400,000 note. As a term of his employment with Gamewell South, Mr. Canter received a base annual salary of approximately $ 60,000. He also was entitled to an annual incentive bonus of 10 percent of the pretax profits. *707 Mr. Canter did not receive 10 percent of the purported sale price of the stock in exchange for his 10-percent interest. Instead, Mr. Canter received 10 percent ($ 450,000) of the purchase price for his Gamewell South stock after the $ 3,123,447 transfer was adjusted out and paid directly to petitioner. Mr. Canter did receive his full 10 percent of the $ 1,500,000 sale price for the assets of Gamewell Two. Mr. Canter knew that if the $ 3,123,447 at issue herein was actually profits of Gamewell South, the shareholders of Gamewell South were entitled to their portion of these profits. Therefore, he questioned petitioner with respect to the $ 3,123,447 and was told by petitioner that it was not his (Canter's) money. After the sale of the stock of Gamewell South and the assets of Gamewell Two, Gamewell North continued to operate as the manufacturer's representative of Gamewell Holdings in the Detroit area. Gamewell North also continued its buy-sell arrangement with Gamewell Holdings. Petitioner continued as the president and CEO of Gamewell South as well. He also continued to sign checks for Gamewell South. Mr. Gray took over management of Gamewell South in June 1985. On the *708 personal return he filed for the 1984 taxable year, petitioner reported as capital gain income proceeds from the sale of the stock of Gamewell South and the assets of Gamewell Two in the amount of $ 6,223,447, inclusive of the $ 3,123,447 passed through. Petitioner did not include in income the $ 111,128 of interest received from Gamewell South in 1984. Petitioner did, however, deduct $ 55,000 on his 1984 personal Federal income tax return for "professional fees." Petitioner was knowledgeable regarding the financial and physical operations of Gamewell South and Gamewell North. He knew their tax and accounting procedures. On November 23, 1988, respondent timely sent a notice of deficiency by certified mail to petitioner determining a deficiency for the 1984 taxable year in the amount of $ 1,079,267 and additions to the tax pursuant to sections 6653(b)(1), 6653(b)(2), and 6661 in the amounts of $ 539,634, 50 percent of the interest due on $ 1,079,267, and $ 269,817, respectively. Respondent also determined that petitioner was liable for the increased interest rate pursuant to section 6621(c). In so doing, respondent determined, inter alia, that $ 3,123,447 reported by petitioner *709 as a capital gain was ordinary income, that petitioner failed to report $ 111,128 of interest income, and that petitioner was not entitled to a Schedule A deduction of $ 55,000 for professional fees. OPINION All issues in this case relate to the personal Federal income tax of petitioner for the taxable year 1984. Respondent determined that petitioner incorrectly treated $ 3,123,447 of the amount he received in the Gamewell South stock sale as capital gains. Instead, respondent argues that the $ 3,123,447 was actually a transfer of profits from Gamewell North through Gamewell South to petitioner. Respondent argues that petitioner did this in order to treat the Gamewell North profits as capital gains instead of ordinary income, as would be the case if petitioner received the profits from Gamewell North directly. Petitioner contends that Gamewell North was holding the money for Gamewell South. Petitioner testified that he did this in order to keep secret, from Gamewell South's employees, the large profits Gamewell South was making. Second, respondent disallowed $ 55,000 of deductions claimed by petitioner for professional fees paid. Respondent argues that petitioner has failed *710 both before and during trial to substantiate the nature of these claimed expenses. Petitioner asserts that the expenses resulted from the accounting fees related to the sale of the Gamewell South stock and the assets of Gamewell Two. Third, respondent determined that petitioner's understatement in income tax resulted in a substantial understatement as set forth by section 6661. Therefore, petitioner should be liable for the substantial understatement addition of section 6661. Petitioner contests the determined understatement by asserting his recognition of the $ 3,123,447 as capital gains was proper. Fourth, respondent determined that the transfer of the $ 3,123,447 from Gamewell North to Gamewell South, immediately before the sale of Gamewell South stock, was a tax-motivated transaction. Thus, petitioner is, according to respondent, liable for the increased interest rate pursuant to section 6621(c). Petitioner alleges that the transfer was unrelated to the sale of Gamewell South stock and that petitioner was not motivated by tax consequences when making the transfer. Fifth, respondent determined that petitioner failed to include interest income in the amount of $ 111,128 *711 he received. Petitioner did not argue the interest income issue in his brief nor did he offer any testimony on this matter during trial. Therefore, we find that petitioner admits his failure to include the interest in income. Finally, respondent determined that petitioner's scheme to convert ordinary income into capital gain and his failure to report interest income were fraudulent, and that by so doing, petitioner intended to evade the payment of tax he knew he rightfully owed. Based on petitioner's scheme, respondent argues that additions to tax pursuant to section 6653(b)(1) and (2) are appropriate. Petitioner contests respondent's determination that the capital gain income classification is incorrect. Petitioner also asserts that his actions do not constitute fraud, but rather a return of profits to the corporation that earned them. Further, petitioner asserts that he should not be liable for additions to tax for fraud since he relied on professional advice in making the transfer. ISSUE 1. Capital Gain v. Ordinary Income
This first issue in this case deals with the treatment of the income earned under the 11 separate contracts for sale of equipment produced *712 by Gamewell South but sold by Gamewell North. Following the year in which the income was earned, Gamewell North transferred the proceeds to Gamewell South. This transfer occurred immediately prior to petitioner's sale of his Gamewell South stock. The income earned under the 11 contracts totaled $ 3,123,447. [3]
Respondent determined that petitioner's treatment of the money transferred to Mr. Gray, and subsequently back to petitioner as capital gain, is incorrect. Instead, respondent contends that the income in question should be treated as ordinary income. Petitioner asserts that the transfer was not related to the sale of his stock in Gamewell South. Instead, petitioner argues *713 that the transfer was merely a return of profits from Gamewell North back to the rightful owner, Gamewell South. Therefore, petitioner contends that the full amount he received for his Gamewell South stock is capital gain, qualifying for the lower capital gain rate. Income must be taxed to the one who earns it. United States v. Basye, 410 U.S. 441 (1973); Commissioner v. Culbertson, 337 U.S. 733, 739-740 (1949). Therefore, an assignment of income is ineffective for tax purposes. Lucas v. Earl,281 U.S. 111 (1930). Further, economic substance of a transaction purporting to be a sale governs over the form the parties used in the transaction when determining Federal income tax liability. Frank Lyon Co. v. United States, 435 U.S. 561 (1978). Respondent has the power to recharacterize the form of a transaction according to its substance. Lacy v. Commissioner, 39 T.C. 1100, 1104 (1963), affd. 341 F.2d 54 (10th Cir. 1965); Harrison v. Commissioner, 17 T.C. 1350 (1952). *714 To be recognized for tax purposes, a transaction must have an economic purpose and substance apart from anticipated tax consequences. Knetsch v. United States, 364 U.S. 361, 365-370 (1960). A close relationship between the parties must be carefully scrutinized. Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 152 (8th Cir. 1974), affg. a Memorandum Opinion of this Court; Hulter v. Commissioner, 91 T.C. 371, 394 (1988). A transfer by one party cannot be transformed for tax purposes into a transfer by another by using the latter as a conduit through which to pass title. Commissioner v. Court Holding, 324 U.S. 331, 334 (1945); Gregory v. Helvering, 293 U.S. 465 (1935). Diversions from a corporation by its sole shareholder are taxable to the shareholder as ordinary income. Truesdell v. Commissioner, 89 T.C. 1280 (1987). The facts clearly indicate that the transfer of the $ 3,123,447 from Gamewell North through Gamewell South to petitioner lacked any economic substance and was *715 merely a transaction to gain tax-favored treatment. It is clear that the parties involved in the transfer and sale treated the funds in question as belonging to Gamewell North before the transaction took place. Gamewell North sent purchase orders to Gamewell South in its own name for the purchase of equipment. Gamewell North then sent bids to the ultimate purchasers which were, along with other factors, partially based on what Gamewell North had to pay for the products it purchased from Gamewell South. Gamewell North received payment from the ultimate purchaser on the sales. Gamewell North then paid commissions to its salesmen out of the payments it received. Gamewell North recorded for accounting purposes the profits it made on the sales. Finally, and most importantly, Gamewell North recognized the amounts it made on the sales as its income and paid Federal income taxes based on its profits, including the sales in question. Gamewell South recorded for accounting purposes the amounts it made on the sales to Gamewell North, not on the amounts paid by the ultimate purchaser. Gamewell South did not note in its books that a portion of its income was being held by Gamewell *716 North. Gamewell South made its normal profit on the sale of its products to Gamewell North. Further, Gamewell South did not recognize in its Federal income taxes any of the proceeds petitioner alleges were being held by Gamewell North for it. Petitioner's accountants, Mr. Glasser and Mr. Rock, did not know of the funds allegedly belonging to Gamewell South, purportedly being held by Gamewell North, until petitioner told them of this arrangement. This disclosure by petitioner came after he had already devised his transfer scheme. Further, neither the books of Gamewell North nor the books of Gamewell South reflected or disclosed this "holding" arrangement. Mr. Gray also thought the funds in question belonged to someone other than Gamewell South. Petitioner and Mr. Gray had come to a tentative understanding that the stock of Gamewell South and the assets of Gamewell Two would be sold for about $ 6,000,000. Of this amount, $ 1,500,000 was for the assets of Gamewell Two while $ 4,500,000 was for the Gamewell South stock. Petitioner then passed $ 3,123,447 to Gamewell South. Following the transfer, petitioner insisted that the sale price be increased by an amount equal to the *717 transferred amount. These facts demonstrate that when Mr. Gray made his initial offer to buy the stock of Gamewell South, tentatively accepted by petitioner, Mr. Gray did not believe that the $ 3,123,447 belonged to Gamewell South. If this amount were already included, Mr. Gray would never have increased his offer to reflect the transferred funds since the funds would have been included in Mr. Gray's initial offer. This understanding by Mr. Gray is further evidenced by the correspondence between petitioner and Mr. Gray during negotiations for the sale of the stock. The correspondence reflects that the price initially agreed upon by the parties for the sale of petitioner's Gamewell South stock was $ 4,500,000. After petitioner's decision to transfer the funds into Gamewell South, Mr. Gray's offer increased by an amount proportional to the funds transferred. Similarly, the record reflects that Sanitas initially offered $ 5,000,000 for the Gamewell South stock and $ 1,000,000 for the assets of Gamewell Two. After petitioner's decision to transfer the Gamewell North funds to Gamewell South, Sanitas' offer increased to $ 10,000,000 for Gamewell South and Gamewell Two, contingent *718 on at least $ 3,000,000 being transferred into Gamewell South before the sale took place. Petitioner's own notes regarding the negotiations show that the increased offers were all based on the assumption that $ 3,000,000 would be transferred by petitioner before the sale. These facts demonstrate that Sanitas also believed that the transferred funds did not belong to Gamewell South. Petitioner's actions during the beginning of negotiations for the sale of his Gamewell South stock are not consistent with his assertion that the $ 3,123,447 belonged to Gamewell South. Petitioner initially agreed to sell the Gamewell South stock for $ 4,500,000 to Mr. Gray. However, after devising the plan to transfer funds from Gamewell North to Gamewell South, petitioner insisted on increasing the price of the stock to directly reflect the transfer. If petitioner had honestly believed that the transferred funds were at all times truly the property of Gamewell South, he would never have tentatively entered into an agreement to sell the stock for a price that did not reflect the cash of Gamewell South held by Gamewell North. Mr. Canter never believed that the transferred assets rightfully belonged *719 to Gamewell South. Mr. Canter, as 10-percent owner of Gamewell South, was to receive 10 percent of the profits of Gamewell South. He never received 10 percent of the $ 3,123,447 transferred, which he would have been entitled to if the proceeds truly belonged to Gamewell South. Further, upon the sale of his 10-percent interest in Gamewell South, Mr. Canter only received $ 450,000, 10 percent of the sale price absent the $ 3,123,447 transfer. If the transferred funds were truly the property of Gamewell South, we would have expected Mr. Canter to receive an amount for his stock somewhat closer to $ 763,344.70 , 10 percent of the sale price with the transfer included. Mr. Canter has monetary reasons for testifying that Gamewell South was indeed the rightful owner. After all, if the proceeds were Gamewell South's, he would have a financial interest in them. Instead, we believe Mr. Canter was truthful in stating that Gamewell South was not the rightful owner. Further, petitioner told Mr. Canter that the money did not belong to Gamewell South or Mr. Canter. Notwithstanding the intent or understanding of the parties involved, the facts demonstrate that Gamewell North, instead of *720 Gamewell South, earned the transferred funds. Gamewell North purchased the goods from Gamewell South and resold them to the ultimate purchaser. Gamewell South made its normal profit percentage on the sales it made to Gamewell North. Gamewell North bore the risks of loss, damage, and replacement. Gamewell North received payment from the ultimate purchaser. Gamewell North paid its salesmen commissions on the sales. Further, Gamewell North reported the proceeds from the sale as income. Gamewell South did not report the transferred funds as income. Petitioner's contention that Gamewell South was the rightful owner of the funds is wholly unsupported by, and inconsistent with, the facts. Further, the transaction itself leads to the conclusion that the transfer was merely a pass-through for tax purposes. For each dollar transferred by Gamewell North to Gamewell South, the purchase price for the Gamewell South stock was increased by one dollar. The increased price did not result in Mr. Canter receiving any greater amount for his interest in Gamewell South. Petitioner received 100 percent of the benefits of the transfer while only owning 90 percent of the stock. The transfer was *721 a wash to everyone except petitioner. Gamewell North, owned entirely by petitioner, parted with over $ 3,000,000 and petitioner received every penny of it. Gamewell South was merely the conduit through which the transfer was accomplished. No business purpose has been established for the transfer other than the tax-favored treatment petitioner attempted to utilize. Petitioner asserts that he had Gamewell North hold the money for Gamewell South so that the employees of Gamewell South would not discover the profitability of the corporation. Petitioner alleges he was afraid that if the employees knew the true profits, they would make demands for increased wages and benefits. Without discussing the policy difficulties this Court has with petitioner's assertion, we find that the facts, actions, and intentions of the parties are inconsistent with petitioner's assertion. If the funds truly belonged to Gamewell South, surely petitioner would have informed potential buyers of their existence before tentatively agreeing on a price. Further, we find it inconceivable that such an arrangement could have existed without there being any notation on the books of Gamewell North or South as *722 to the existence of such an arrangement. The manner in which petitioner handled the transferred funds is also persuasive that the transfer was nothing more than a scheme to acquire better tax treatment. Petitioner made sure that the funds transferred from Gamewell North to Gamewell South were kept in a separate bank account of Gamewell South. Petitioner had total control over the account and even commingled some of his own income in the account as well. Petitioner went so far as to instruct Mr. Wilhelm, Gamewell South's bookkeeper, to remit all interest earned on the account to petitioner. He further instructed Mr. Wilhelm on how to account for the interest on the books of Gamewell South so as to create a wash. Once the sale was finalized, petitioner relinquished the funds to Mr. Gray immediately prior to the sale and then, later the same day, made sure the funds were retransferred back to his account. Based on the above, we find that petitioner's transfer lacked any economic substance for Gamewell North or Gamewell South, and was merely a device used solely for the purpose of gaining favored tax treatment for petitioner. The $ 3,121,447 transfer was nothing more than a receipt *723 of funds by petitioner from his wholly owned corporation, Gamewell North, through a conduit, Gamewell South. We therefore find that the uncontroverted facts and the economic realities of the transaction dictate that the true sales price of the Gamewell South stock was $ 4,500,000 and that the transfer of $ 3,123,447 was nothing more than a funnelling of funds to petitioner from his wholly owned corporation, Gamewell North. Consequently, the $ 3,123,447 is ordinary income, subject to tax treatment as such, and not capital gain from the sale of stock. ISSUE 2. Deduction For Professional Fees
Respondent determined that the $ 55,000 deduction petitioner took for professional fees should be disallowed for lack of substantiation and proof of entitlement thereto. Petitioner asserts that the professional fees were, in part, incurred for professional accounting services related to the negotiations for, and sale of, Gamewell South and Gamewell Two. Petitioner bears the burden of proof to show that he is entitled to deductions greater than those allowed by respondent. Welch v. Helvering, 290 U.S. 111 (1933); *724 Rule 142(a). This burden of proof includes establishing both the right to and the amount of the deduction. Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134 (1974); New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). In the case at hand, petitioner's assertion that a majority of the amount deducted was incurred for accounting advice related to the sale of stock is totally unsubstantiated. At trial, Mr. Glasser, one of petitioner's accountants, testified that the records for the deductions in question were no longer kept by them due to the number of years that had passed. Mr. Glasser also said that Mr. Rock, petitioner's other accountant, had better knowledge of petitioner's accounting expenses, and the resulting deductions, since he had worked on the relevant jobs. During Mr. Rock's testimony, however, petitioner never asked him about any of the costs from which the deductions arose. Since petitioner has not submitted any substantiation as to his right to the professional fee deduction nor has he submitted any substantiation as to the amount of any such deduction, petitioner has not met his burden of proof. Thus, *725 petitioner's deduction of $ 55,000 for professional fees is disallowed. ISSUE 3. Substantial Understatement
Respondent determined that petitioner's understatement of income taxes resulted in a substantial understatement under section 6661. Respondent contends that petitioner substantially understated his income taxes by treating the transfer of $ 3,123,447 as capital gains instead of ordinary income, claiming deductions for which he had no substantiation, and omitting interest income of $ 111,128. Petitioner contests respondent's determination that the $ 3,123,447 should be treated as ordinary income and further contests respondent's determination that the professional fees are not deductible. Once these aspects of the understatement are removed, petitioner asserts the section 6661 addition to tax is inappropriate. Section 6661 provides a 25-percent addition to tax if there is a substantial understatement of income tax in the year at issue. In determining if an understatement is substantial, section 6661(b)(2)(B)(ii) provides for a reduction of the understatement where there *726 is, or was, substantial authority for petitioner's treatment. Taking into account the above limitation, an understatement is substantial if it exceeds the greater of $ 5,000 or 10 percent of the tax required to be shown for the taxable year. In the case before us, the facts indicate that the $ 3,123,447 transferred from Gamewell North to Gamewell South did indeed belong to Gamewell North. Both corporations acted consistently with the proposition that the buy-sell agreement was still in effect. Gamewell North collected the proceeds from the ultimate purchaser and then, independently, sent payment to Gamewell South for the products it purchased. Gamewell North recognized the difference in the invoice amounts as its income, paying 60 percent of it to its salespeople as commissions and recognizing the other 40 percent as profits. Gamewell North reported the profits on the sales in question for Federal income tax purposes as income. Further, Gamewell South reported income for Federal income tax purposes on only those amounts paid to it by Gamewell North, not the entire profit amount. No substantial authority has been presented by petitioner which provides a proper basis for petitioner *727 to rely on in treating the transferred funds as anything other than ordinary income. Further, as discussed earlier in this opinion, petitioner failed to substantiate the claimed professional fee deductions. Finally, it is undisputed that petitioner had no authority to rely on, substantial or otherwise, when omitting interest income from his 1984 Federal tax return. Therefore, petitioner's understatement, not attributable to substantial authority in its treatment, does exceed 10 percent of the tax required to be shown for petitioner's 1984 taxable year. Therefore, petitioner is liable for the 25-percent addition to tax under section 6661. ISSUE 4. Tax-motivated Transaction
Respondent determined that the increased interest rate of section 6621(c)[4] is applicable since petitioner intended to avoid the payment of taxes by claiming the capital gains rate on the $ 3,123,447 transferred to him, instead of claiming the ordinary rate. *728 Section 6621(c) provides for an interest rate of 120 percent of the rate set forth in section 6621(b), with respect to any underpayment in excess of $ 1,000, which is attributable to a tax-motivated transaction. Section 6621(c)(3)(A)(v) defines a tax-motivated transaction as "any sham or fraudulent transaction." This section applies to interest accruing after December 31, 1984, even though the transaction was entered into prior to that date. DeMartino v. Commissioner, 88 T.C. 583 (1987); Zirker v. Commissioner, 87 T.C. 970 (1986); Solowieiczvk v. Commissioner, 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). We have held in the past that transactions without economic substance constitute a sham or fraudulent transaction. Patin v. Commissioner, 88 T.C. 1086, 1128-1129 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), *729 affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). The facts, as discussed earlier herein, clearly demonstrate that petitioner developed his transfer scheme in order to take advantage of the lower tax rate for capital gains, rather than pay the higher ordinary income tax rate. This higher rate would have applied had petitioner taken the money directly from Gamewell North as a dividend. Petitioner spoke freely with Mr. Gray during negotiations concerning his tax scheme. He even turned down a more lucrative offer from Sanitas in order to make use of the scheme to report income at the lower capital gains rate. The record is devoid of any reason, other than tax motivation, why petitioner would have turned down the more lucrative offer from Sanitas. However, there is ample testimony in the record before us to support the notion that petitioner transferred the funds solely for the tax benefits he would receive. The record further indicates that the transaction was a fraudulent sham. Based on the testimony of the witnesses, and the record before us, we find that petitioner was motivated solely by tax concerns when he perpetrated his scam in *730 transferring the $ 3,123,447 from Gamewell North through Gamewell South to himself. Therefore, the increased interest rate of section 6621(c) is applicable. ISSUE 5. Additions To Tax For Fraud
Respondent determined that additions to tax for fraud were appropriate in that petitioner consistently and substantially understated his income. Respondent argues that such understatements by petitioner were intentional and were intended to evade tax petitioner knew he rightfully owed. Second, respondent argues that petitioner's diversion of corporate funds for his personal use is indicative of fraud. Third, respondent argues that petitioner attempted to conceal the true nature of the $ 3,123,447 transfer. Finally, respondent argues that petitioner was an intelligent man who knew that what he was doing was fraudulent. Petitioner argues that he was not fraudulent in that the transfer of the $ 3,123,447 was not related to the sale of his stock. Therefore, petitioner argues that the proceeds received by him for the sale of his stock were properly reported as capital gains. Further, petitioner asserts that he relied upon the advice of competent advisers after making full disclosure. *731 Section 6653(b) provides for an addition to tax if any part of a year's underpayment is due to fraud. The addition to tax is an amount equal to 50 percent of the amount of the underpayment. The burden of proving fraud by clear and convincing evidence is upon respondent. Sec. 7454(a); Rule 142(b); Stone v. Commissioner, 56 T.C. 213, 220 (1971). Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing. Professional Services v. Commissioner, 79 T.C. 888, 929-930 (1982); Estate of Pittard v. Commissioner, 69 T.C. 391, 400 (1977). Whether fraud exists with respect to a particular tax year is a factual question which must be resolved by an examination of the entire record. Since fraud can seldom be established by direct proof, the requisite intent may be inferred from any conduct, the likely effect of which would be to conceal, mislead, or otherwise prevent the collection of taxes that petitioner knew or believed he owed. Spies v. United States, 317 U.S. 492, 499 (1943); Rowlee v. Commissioner, 80 T.C. 1111 (1983); *732 Professional Services v. Commissioner, 79 T.C. at 930. Respondent need not prove the precise amount of underpayment resulting from fraud, but only that there is some underpayment and that some part of it is attributable to fraud. Otsuki v. Commissioner, 53 T.C. 96, 105 (1969). We must determine whether petitioner voluntarily and intentionally evaded a tax which he knew he was obligated to pay. The underpayment must have resulted from something more that petitioner's honest mistake as to the transfer involved and his failure to report income. Many facts exist in this case that clearly and convincingly establish that petitioner blatantly and intentionally endeavored to conceal, mislead, and otherwise prevent the collection of tax knowingly owed by him. Examining all of the facts as a whole, respondent has proven that petitioner acted fraudulently. During 1984, petitioner underreported his income by intentionally reporting $ 3,123,447 as capital gains rather than ordinary income. Further, petitioner underreported his income by omitting $ 111,128 of interest income from his return altogether. Petitioner directed Mr. Wilhelm to pay out the *733 interest to petitioner. Further, petitioner directed Mr. Wilhelm on how the interest should be accounted for on the books of Gamewell South. We find petitioner's testimony that he merely forgot about over $ 110,000 of income he received contrary to the facts, self-serving, and incredible. The facts support the finding that petitioner intended to deceive respondent by transferring the $ 3,123,447 from Gamewell North to Gamewell South and then having the funds returned to him as part of a transaction for the sale of his Gamewell South stock. Petitioner did this in order to convert income, otherwise taxable at the ordinary rates, into capital income, taxed at the lower capital gains rate. The fact that petitioner had come to an informal sale price for his stock with Mr. Gray, and then restructured the transaction to pass through the $ 3,123,447, is evidence of his intent to deceive. Petitioner's conversations with Mr. Gray concerning his tax motivations regarding the transfer is even stronger evidence of this intent. The timing of the transfer in relation to the timing of petitioner's sale of his Gamewell South stock is also evidence of petitioner's intent to deceive. Petitioner *734 did not begin transferring the $ 3,123,447 to Gamewell South until he had already come to terms for the sale of his stock. Since there were a few aspects of the sale to be worked out, petitioner further protected himself by holding the funds in an account separate from Gamewell South's normal operating account. Petitioner even commingled some of his own income in this separate account. Once the sale of Gamewell South stock was finalized, then, and only then, did petitioner relinquish control of the transferred funds. However, petitioner had fashioned the sale so that on the same day he transferred the funds, they were retransferred back to his own account. Once the transfer was accomplished, petitioner used his corporate position to conceal the true nature of the transfer. He instructed Mr. Wilhelm to prepare an invoice to reflect an advance payment for the $ 2,040,000 transfer of May 31, 1984. Petitioner knew the transfer was not an advance payment and he further knew that no purchase order would be forthcoming regarding the "advanced payment." Further, in 11 instances, petitioner caused contract prices on jobs-in-progress to be increased to reflect the $ 3,123,447 returned *735 to Gamewell South. Again, petitioner knew there was no economic reason for the increases, except to "hide" the proceeds he transferred. Petitioner also made sure that the transferred funds were not kept in the ordinary accounts of Gamewell South. The concealment of bank accounts is another indicia of fraudulent intent. Gunn v. Commissioner, 247 F.2d 359 (8th Cir. 1957), affg. a Memorandum Opinion of this Court. Also, petitioner had the interest from the account returned to him in a manner that would result in a wash on the books of Gamewell South. To further conceal the transaction, petitioner then "forgot" to report the $ 111,128 of interest he received. Petitioner's argument that he did not receive a Form 1099 is totally without merit considering it was his instructions to Mr. Wilhelm that made sure the interest would be treated in a manner insuring no Form 1099 would be generated. The facts demonstrate that petitioner took all actions he could to "cover his tracks" in hopes that his scheme would not be discovered. Petitioner also took corporate funds of Gamewell North and used them for his own personal uses. He was able to transfer these funds because *736 of his position as the controlling shareholder and president of Gamewell North. The diversion of corporate funds for personal use by the controlling shareholder or president is indicative of fraud. The record is clear that after coming to an agreement for the sale of petitioner's Gamewell South stock to Mr. Gray, petitioner developed a scheme to transfer funds of Gamewell North through Gamewell South to himself personally. All parties involved treated the transferred income in question as Gamewell North's before petitioner developed his scheme. Gamewell North reported the income and paid tax on it while Gamewell South did not. Gamewell South did not pay 10 percent of the profits to Mr. Canter, as would have been the case if the proceeds belonged to Gamewell South. Gamewell North paid commissions out of the proceeds, instead of Gamewell South. These facts indicate that the 11 sales were pursuant to the buy-sell agreement between Gamewell South and North, rather than pursuant to a commission sale. Petitioner's primary defense that he relied on his attorney's and accountant's advice in transferring the funds is not persuasive. *737 In order for petitioner to utilize the defense of reliance on professional advice, full disclosure of all facts must have been made to the professionals so that they could offer advice based on the full record. United States v. Michaud, 860 F.2d 495, 500 (1st Cir. 1988). Both Mr. Glasser and Mr. Rock testified that they had no prior knowledge of any funds owned by Gamewell South being held by Gamewell North. Mr. Glasser also testified that he had little knowledge of the books, records, and activities of Gamewell North. Next, Mr. Glasser's and Mr. Rock's advice did not go to the issue of ownership of the funds. Instead, the record indicates that petitioner told his accountants that the money belonged to Gamewell South. Further, no evidence was presented to establish that petitioner relied on any third party's advice in reporting the transferred funds as capital gains. Mr. Weiner, petitioner's attorney, may have had knowledge of petitioner's reliance on professional advice. However, Mr. Weiner was not called to testify on behalf of petitioner at trial. Petitioner's failure to call a witness available to him leads to the conclusion that, if called, his testimony *738 would have been unfavorable. Petzoldt v. Commissioner, 92 T.C. 661 (1989); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Based on the above, we find that petitioner did not establish that he relied on any third party when transferring, or reporting as income, the funds in question. Petitioner is a shrewd and extremely successful businessman. His actions were consistent with a person attempting to conceal a transaction that would result in an underpayment in his taxes that he knew he rightfully owed. In examining petitioner's actions related to the transfer of funds and omission of interest income, we find that respondent has clearly and convincingly established that petitioner acted fraudulently. Therefore, the additions to tax under section 6653(b)(1) and (2) are appropriate. CONCLUSION
We have examined petitioner's other arguments and find them wholly unpersuasive and without merit. Due to concessions by both parties, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Two of the 11 contracts for sale at issue in this case were entered into during 1980 and 1981 when H-VAC was the exclusive Detroit-area sales representative for Gamewell South. These two contracts for sale are discussed herein, infra↩. For purposes of simplicity in this opinion, when we discuss the contracts for sale entered into by Gamewell North, the two H-VAC contracts are hereby included by this reference.
3. The transfer of funds from Gamewell North to Gamewell South, made in two separate transfers, totaled $ 3,100,530. However, petitioner commingled some of his personal income in the account with the transferred funds. Therefore, for our purposes, the amount transferred to petitioner through Gamewell South totals $ 3,123,447.↩
4. Section 6621(c) was formerly section 6621(d)↩.